**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| INTERNATIONAL UNION OF PAINTERS & ALLIED TRADES, DISTRICT COUNCIL NO. 11; DISTRICT COUNCIL NO. 11 APPRENTICESHIP & TRAINING FUND; DISTRICT COUNCIL NO. 11 LABOR MANAGEMENT PARTNERSHIP FUND; RHODE ISLAND PAINTERS & ALLIED TRADES, LOCAL UNION 195 HEALTH AND WELFARE FUND; and RICHARD J. TROUVE, in his official capacity as Business Representative for District Council No. 11 and Painters Local 195, Plaintiffs, | C.A. No. 04-145ML |
| v. | |
| KEITH ROBINSON PAINTING, INC., Defendant. | |

**PLAINTIFFS' LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED**

Pursuant to Local Rule 56.1, Plaintiffs International Union of Painters & Allied Trades, District Council No. 11, et. al. submit their Statement in support of their Motion for Summary Judgment.

1. Plaintiff International Union of Painters and Allied Trades, District Council No. 11 ("District Council No. 11") is a labor union within the meaning of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1002(4) and within the meaning of the Labor Management Relations Act ("LMRA"), 29 U.S.C. §152(5).

2. Plaintiff District Council No. 11 Apprenticeship and Training Fund ("Apprenticeship Fund") is an employee welfare benefit plan within the meaning of ERISA, 29 U.S.C. §1002(1).

3. Plaintiff District Council No. 11 Labor Management Partnership Fund ("Partnership Fund") is an employee welfare benefit plan within the meaning of ERISA, 29 U.S.C. §1002(1).

4. Plaintiff Rhode Island Painters and Allied Trades, Local Union 195, Health and Welfare Fund ("Health and Welfare Fund") is an employee welfare benefit plan within the meaning of ERISA, 29 U.S.C. §1002(1). The Health & Welfare Fund is in the name of the Rhode Island Painters and Allied Trades Local Union 195 ("Painters Local 195") and is governed by the CBA.

5. Plaintiff Richard J. Trouve was, at all relevant times, the business representative for District Council No. 11 and Painters Local 195 and a trustee for the Health and Welfare Fund.

6. The Apprenticeship Fund, Partnership Fund, and Health & Welfare Fund were established to provide benefits, namely medical benefit and employment training, for members of District Council No. 11 and Painters Local 195. All three Funds are administered by a separate Board of Trustees consisting of management and union trustees.

7. Benefits as aforesaid are financed in part by employer contributions. The contribution rate is set by the CBA.

8. Defendant Keith Robinson Painting, Inc. ("Robinson" or "Defendant") and District Council No. 11 were, at all relevant times, parties to a CBA, attached hereto as Exhibit 1. See Defendant's Answer ¶ 17.

9. Article XII of the CBA provides that Defendant shall make contributions to the following funds for each hour worked by each employee covered under the CBA ("covered employee"): the Health and Welfare Fund, the Apprenticeship Fund, and Partnership Fund (collectively referred to as "Funds"), among others.

10. Article XII of the CBA also sets the contribution rates for the Funds.

11. The rights and obligations of Defendant and the Funds are set forth in three separate Trust Agreements. See CBA Article XV.

12. Each Trust Agreement provides, in relevant part, that Defendant shall promptly pay contributions, and pay penalties and interest when in default.

13. The CBA also requires Defendant to deduct dues from the paychecks of employees covered under Article XV § 5 and remit such dues to District Council No. 11.

14. From October 2003 through December 2003, covered employees performed painting services for Defendant. However, Defendant failed to make contributions to the Funds as required by the CBA and the Trust Agreements. See Affidavit of Richard Trouve, Exhibit 2.

15. From October 2003 through December 2003, Defendant deducted dues from the paychecks of covered employees but failed to remit such dues to District Council No. 11 as required by the CBA. See Exhibit 2.

16. From October 2003 through December 2003, Defendant reported to the Funds that covered employees worked 2989.5, 2910.5 hours and 1616.5 hours, respectively. Exhibit 2.

17. Pursuant to the CBA, the hourly rate of contributions Defendant owes for the aforementioned period of time to the Health and Welfare Fund is $4.60. Accordingly, Defendant owes $34,575.90 to the Health and Welfare Fund for the months of October through December 2003. See Exhibit 3.

18. Pursuant to the CBA, the hourly rate owed to the Apprenticeship Fund is $.35. Accordingly, Defendant owes $2,630.79 to the Apprenticeship Fund for the months of October through December 2003. See Exhibit 3.

19. Pursuant to the CBA, and the hourly rate owed to the Partnership Fund is $.05. Accordingly, Defendant owes $375.84

to the Partnership Fund for the months of October through December 2003. See Exhibit 3.

20. From October through December 2003, Defendant deducted, and failed to remit, $8,805.56 from covered employees' paychecks. Accordingly, Defendant owes $8,805.56 to the District Council No. 11 for the months of October through December 2003.

21. From the period of October 2003 through December 2003, Defendant owes Plaintiffs a total of $46,388.09, not including interest and penalties.

Respectfully Submitted
PLAINTIFFS
By their Attorney,

Elizabeth Wiens, Esq. #6827
GURSKY LAW ASSOCIATES
420 Scrabbletown Rd., Ste. C
North Kingstown, RI 02852
Tel. (401)294-4700
Fax. (401)294-4702

CERTIFICATION

I hereby certify that a true copy of the within was sent via first class, postage pre-paid mail on this 21 day of June, 2005 to the following parties:

Linn F. Freedman, Esq.
Nixon Peabody LLP
1 Citizens Plaza, 7th Floor
Providence, Rhode Island 02903

Little, Medeiros, Kinder, Bulman & Whitney, P.C.
72 Pine Street
Providence, RI 02903

# EXHIBIT 1

# I N D E X


| | | PAGE |
|---|---|---|
| | AGREEMENT AND PREAMBLE | 1 |
| ARTICLE I | RECOGNITION CLAUSE | 1 |
| ARTICLE II | WORK JURISDICTION | 1-5 |
| ARTICLE III | UNION SECURITY CLAUSE | 5-6 |
| ARTICLE IV | OUT OF AREA WORK CLAUSE | 7 |
| ARTICLE V | SUPPORT OF PRIMARY ACTIVITY | 8 |
| ARTICLE VI | TERRITORIAL JURISDICTION | 8 |
| ARTICLE VII | JOB REGISTRATION | 8 |
| ARTICLE VIII | WAGE RATES | 9 |
| ARTICLE IX | HOURS OF WORK | 10 |
| ARTICLE X | BRIDGE PAINTING | 11 |
| ARTICLE XI | APPRENTICE WAGE AND RATIOS | 11 |
| ARTICLE XII | FRINGE BENEFIT CONTRIBUTIONS | 12-13 |
| ARTICLE XIII | PAYMENT OF WAGES | 13-14 |
| ARTICLE XIV | MARKET RECOVERY | 14 |
| ARTICLE XV | EMPLOYER CONTRIBUTIONS AND PAYROLL DEDUCTIONS | 14-21 |
| ARTICLE XVI | UNION REPRESENTATION | 21-22 |
| ARTICLE XVII | TRADE RULES AND WORKING CONDITIONS | 22-23 |
| ARTICLE XVIII | INSURANCE | 223 |
| ARTICLE XIX | SAFETY | 23-24 |
| ARTICLE XX | NO SUBCONTRACTING CLAUSE | 24 |
| ARTICLE XXI | PRESERVATION OF WORK | 24-25 |
| ARTICLE XXII | FUNCTION OF MANAGEMENT | 25 |
| ARTICLE XXIII | GRIEVANCE PROCEDURE | 26-27 |
| ARTICLE XXIV | GENERAL SAVINGS CLAUSE | 27 |
| ARTICLE XXV | DURATION CLAUSE | 28 |

# A G R E E M E N T

This Agreement is made and entered into this 1st day of June, 2003, by and between ______________________________ (name of contractor or contractor's association) hereinafter referred to as the Employer, and District Council No. 11 affiliated with the International Union of Painters and Allied Trades, AFL-CIO, CLC (IUPAT), hereinafter referred to as the Union.

## P R E A M B L E

It is the intent and purpose of the parties to this Agreement to promote harmonious cooperation between the Union, Employer, and Employees, to provide orderly collective bargaining relations between the Union, Employer, and Employees, to provide procedure for the prompt, fair, and peaceful adjustments of all disputes or differences which might arise from time to time, and to provide for the operation of the business of the Employer by methods which will further, to the fullest extent possible, efficiency of operation, quality, and quantity of performance and the protection of the property of the Employer, and that there shall be no interference with the operation of the business of the Employer during the term of this Agreement.

Each of the parties to this Agreement agrees that it is the duty of the Union, Employer, and Employees, to cooperate faithfully, fully, and individually and collectively in the observance of the provisions of this Agreement.

## ARTICLE I

## RECOGNITION CLAUSE

The Employer recognizes, acknowledges, and agrees that District Council No. 11 is, within the meaning of Section 9(a) of the National Labor Relations Act, the exclusive representative for the purpose of collective bargaining, of all the Employer's employees wherever such employees may be employed, in the following classifications of work:

## ARTICLE II

## WORK JURISDICTION

This District Council shall have jurisdiction over all workers engaged in: all painting, decorating and coatings applications and wall covering; all levels of drywall and wall finishing; any and all labor, material, tools or equipment for preparatory work or surface treatment

work in relation to painting, decorating and coatings applications, wall covering, drywall and wall finishing; glazing; architectural metal and glass work; paint and coatings manufacturing; sign, convention and display work; show decorators; scenic artists and designers; metal polishers; civil service, public and professional employees; book binding; maintenance work; chemical, clerical and warehouse workers; any and all units, as well as apprenticeable crafts, that have historically been part of this District Council; and any and all work as may be obtained and maintained through organizing and collective bargaining. Such work shall include, but not limited to:

a) **Painters:** Work will include, but not be limited to: (1) preparation, application and removal of all types of coatings and coating systems in relation to all painting, decorating, protective coatings, coating and staining of concrete floors and toppings, waterproofing, masonry restoration, fireproofing, fire retarding, metal polishing, refinishing, sealing, lining, fiberglassing, E-Glass fiberglass, carbon fiber, encapsulating, insulating, metalizing, flame spray, the application of Exterior Insulating Finishing Systems; (2) each and all such applications, and similar or substitute applications, on all surfaces, interior and exterior, to include, but not be limited to: residences; buildings; structures; industrial, power, chemical and manufacturing plants; bridges; tanks; vats; pipes; stacks; light and high tension poles; parking, traffic and air strip lines; trucks; automobile and railroad cars; ships; aircraft; and all machinery and equipment; (3) any and all material used in preparation, application or removal of any paint, coatings or applications, including, but not limited to: the handling and use of thinners, dryers, sealers, binders, pigments, primers, extenders, air and vapor barriers, emulsions, waxes, stains, mastics, plastics, enamels, acrylics, epoxy injection and T-Lock welding, alcalyeds, sheet rubber, foams, seamless and tile-like coatings, etc.; (4) all preparation for and removal of any and all materials for finishes, such as deep cleaning, patching, all levels of finishing, taping/finishing, skim coating, pointing, caulking, high pressure water, chemical and abrasive blasting, environmental blasting, wet/dry vacuum work, chemical stripping, scraping, air tooling, bleaching, steam cleaning, asbestos and lead abatement/removal; (5) the inspection of all coatings and /or coating systems during their applications will be performed by members of this District Council.

(b) **Wall Covering** work will include, but not limited to: (1) all material applied to walls or ceilings with adhesive, staples, tacks, by stretching or adhered by any other method, including all papers, vinyls, flexible woods, fabrics, borders, metals, upholstered wall systems, the fabric covered panels made of plastic/wood or prefinished products of micor fiberglass, etc., acrovin and various plastic wall coverings such as wainscot, caps, corner moldings and accessories; (2) any and all preparation of walls and ceilings such as scraping or any methodology for removal of existing materials, including patching, leveling, skim coating and priming.

(c) **Drywall Finishing** work will include, but not be limited to: (1) the preparation or leveling of any surface or substrate which is to receive a coating, finish and/or wall covering; this will include, but not be limited to, all levels of finishing and/or spackling of all surfaces,

including gypsum wallboard taping and finishing, fire taping and all firestopping systems, glaze coatings, skim coating or any other finishing system, spotting of nails, installation and finishing of corner beads/flex beads. Patching and sanding is within the system of preparing surfaces for finishes. (2) all stucco and dryvit systems will be performed by members of this District Council.

(d) **Glazing, Architectural Metal and Glass Workers:** General Glazing will include, but not be limited to: (1) the installation, setting, cutting, preparing, fabricating, distributing, handling or removal of the following: art glass, prism glass, beveled glass, leaded glass, automotive glass, protection glass, plate glass, window glass, pre-glazed windows, mirrors of all types, wire glass, ribbed glass, ground glass, colored glass, figured glass, vitrolite glass, carrara glass, all types of opaque glass, glass chalk boards, structural glass, curtainwall systems, louvers, tempered and laminated glass, thiokol, neoprene, all types of insulating glass units, all plastics or other similar materials when used in place of glass to be set or glazed in its final resting place with or without putty, vinyl, molding, rubber, lead, sealants, silicone and all types of mastics in wood, iron, aluminum, sheet metal or vinyl sash, skylights, doors, frames, stone wall cases, show cases, book cases, sideboards, partitions and fixtures; (2) the installation of the above materials when in the shop or on the job site, either temporary or permanent, on or for any building in the course of repair, remodel, alteration, retrofit, or construction; (3) the installation and welding of all extruded, rolled or fabricated materials including, but not limited to, all metals, plastics and vinyls, or any materials that replace same, metal and vinyl tubes, mullions, metal facing materials, corrugated flat metals, aluminum panels, muntins, facia, trim moldings, porcelain panels, architectural porcelain, plastic panels, unitized panels, skylights, showcase doors, all handrails and relative materials, including those in any or all types of building related to store front, door/window construction and curtain wall systems; (4) the installation of automatic door entrances, door(s) and window(s) frame assemblers such as patio sliding or fixed doors, vented or fixed windows, shower doors, bathtub enclosures, storm sash where the glass becomes an integral part of the finished product, including the maintenance of all of the above; (5) bevelers, silverers, scratch polishers, abrasive blasters, flat glass wheel cutting, mitre cutters, engravers, hole drilling, machine operations belt machines and all machines used in the processing of glass, automatic beveling, silvering, grinding, polishing, unpacking and racking of glass, packing glass, glass cleaners in shops, mirror cleaning, assembling, framing and fabrication and assembling of all insulated and non-insulated units, fabrication and mounting of mirrors and the operations of all machines and equipment for these operations; (6) the selecting, cutting, preparing, designing, art painting, and installing of fused glass, thick facet glass in concrete and cementing of art glass, and the assembly and installing or removal of all art glass, engraving, drafting, etching, embossing,designing, abrasive blasting, chipping, glass bending, glass mosaic workers, cutters of all flat and bent glass; glass shade workers, and glaziers in lead or other glass metals; the fabrication and distribution of all glass and glass-

related products; (7) any and all transportation, handling, unloading and loading of tools, equipment and materials will be performed by the members of this District Council.

(e) **Paint Makers** will include, but not be limited to all workers engaged in the mixing, testing, preparing and/or manufacturing of paint, coating, caulking, putty, sealants, etc. and handling of lead, color,oil, lacquer, varnish, synthetic resin, acrylic paints and coatings, etc., including any and all materials for the same.

(f) **Sign and Display:** Sign and Display Painters' work shall include, but not be limited to: (1) the making and installation of all signs and servicing of same, designing, lettering and pictorial work of any kind, including vinyl signs and vinyl substrates and the preparing for the finishing of same, be it by hand brush, roller, spray, mechanical or computer-aided and by any other method or process pertaining to same; (2) they shall have control of all branches, methods and processes of screen process work; tube bending and display work such as creating, designing,building and finishing of all display matter and its related operations used for advertising purposes, including all art work and lettering whether it is done by hand, mechanical or computer aided or by any other method or process pertaining to same; (3) the construction, erection and maintenance of all billboards and all communication advertising will be done by members of this District Council.

(G) **Display Convention and Show Decorators:** The display convention and show decorators' work will include, but not be limited to: (1) the delivery, loading and unloading and the installation and removal of all exhibits (floor to ceiling) and related materials in connection with trade shows and conventions, including, but not limited to: trade show and convention booth assembly and disassembly; installation and removal of interior and exterior decorations, flags, drapes and other display materials; uncrating, assembly, installation, removal, disassembly and recrating of all commercial exhibits; (2) the installation and dismantling of furniture owned by the employer, the installation and removal of floor coverings and special event displays; (3) the construction, preparation, erection and maintenance of all signs, lettering, pictorial work, screen process work, show card writing, commercial exhibits and fabrication of advertising displays and pattern and sketch making, scale model making, the preparation of training aids and mockups and application of plastic, scotchlite and similar reflective materials.

(h) **Scenic Artists and Designers:** Scenic Artists' and Designers' work will include, but not be limited to: models, sketches, carpenter drawings, painting for theatrical productions, motion picture settings and all the various effects; the painting of properties and decorations which may be used to decorate stage, motion picture and TV settings, mural paintings, display creations, costumes and the art of make-up and all its various effects.

(i) **Metal Polishers:** Metal Polishers' work will include, but not be limited to: new construction and existing sites consisting of metal polishing, both the initial and continuing maintenance which shall include, but not be limited to, coloring, lacquering, spraying, application of vinyl coatings, cleaning, polishing and finishing of ornamental and architectural iron, bronze, brass, nickel, aluminum, stainless steel and all metal specialty work.

(j) **All Tools, Equipment and Material:** (1) the handling, assembling, disassembling, operation, maintenance, storage and transporting of all tools, equipment and material used or that may be used by members of this District Council in performing their trade or work; (2) the loading and unloading of any and all materials, tools and equipment will be done by any members and units coming under the District Council's jurisdiction; (3) tools, material and equipment, as used herein, shall include, but not be limited to, brushes, rollers, spray painting equipment, coating applicators, all miscellaneous hand and power driven tools, all robotic, computerized mechanical and manually operated abrasive, shot, bead, water and related blasting equipment, containment systems, ventilation/dehumidification systems, vacuum recovery units, wet and dry vacuum systems and any and all related safety equipment, ladders, scaffolding, lifts and all other dedicated rigging, including the handling, erection and dismantling of same, the operation and maintenance of all types and sizes of compressors.

(k) **Related Work:** Members of this District Council shall also have jurisdiction of: (1) all processes and procedures for decontamination of all contaminated areas; (2) all clean-up of any type debris caused by or during the preparation and/or application of any work described in this Section.

(l) **Technological Improvements, Advancements, New or Substitute Systems or Processes and/or New or Substitute Materials:** The jurisdiction of this District Council shall include and extend to any and all new or substitute system or processes, new or substitute materials and technological improvements or advancements in any existing or new system, process or material that is referred to or incorporated in any provisions in the General Constitution or any collective bargaining agreement to which the International or any of its subordinate bodies is a party.

The foregoing is not all inclusive and may be enlarged or otherwise changed by the action of the General Executive Board. Such changes shall automatically become part of this Agreement when enlarged or otherwise changed by action of the General Executive Board or the General Convention. The parties to this Agreement agree to adhere to all changes made, by mutual consent, in accordance with this Section.

## ARTICLE III

## UNION SECURITY CLAUSE

1. All present employees who are members of the Union on the effective date of this Agreement or on the date of execution of this Agreement, whichever is later, shall remain members of the Union in good standing as a condition of employment. All present employees who are not members of the Union and all employees who are hired hereafter shall become and remain members in good standing of the Union as a condition of employment on and after the eighth (8th) day following the beginning of their employment, or on and after the eighth (8th) day following the effective day of this Agreement or the date of execution of this agreement, whichever is later. In the event that a workman fails to render the application processing fee or that a member of the Union fails to maintain his membership in accordance with the provisions of this Section, the Union shall notify the Employer in writing and such notice shall constitute a request to the Employer to discharge said individual workers within forty-eight (48) hours (Saturdays, Sundays, and Holidays excluded) for failure to maintain continuous good standing in the Union in accordance with its rules above referred to in this paragraph, and the Employer shall discharge such workers at the end of such period.

2. In the employment of workers for all work covered by this Agreement, the following provisions shall govern:

(a) The Union shall be the sole and exclusive source of referrals of applicants for employment. The employer will hire Union members only through the Union.

The Employer will give the Union no less than twenty-four (24) hours notice prior to hiring additional employees so its representative can supply a list to its unemployed members who are available for work and post notice in its day room so its members can make application with the Employer for the available work.

If the Union is unable to refer qualified applicants for employment to the Employer within twenty four hours from the time of receiving such request, the Employer shall be free to secure applicants without using the referral procedures.

When exercising their right to hire employees from any source, the Employer agrees to give preference to those applicants who have exhibited experience that can be documented by:

(1) A satisfactory work history performing the available work with said Employer.

(2) A reasonably active work history performing the available work under the terms and conditions of this Working Agreement.

(3) A reasonably active work history performing the available work.

(b) If workers are so employed, the Employer shall, within twenty-four (24) hours, report to the Union or its agent such workers by name and social security number.

(c) When employing workers, the Employer shall notify the Union within twenty-four (24) hours giving the worker's name, social security number, address, telephone number, and employment location.

(d) The Employer has the right not to hire any applicant for employment and to fire any employee for just cause.

3. In the event that any Employer violates any of the provisions of this Section, the Union may resort to all available legal or economic recourse including cancellation of this Agreement notwithstanding any other provisions of this Agreement.

## ARTICLE IV

## OUT OF AREA WORK CLAUSE

(a) The contractor or the Employer party to this Agreement, when engaged in work outside the geographical jurisdiction of the Union party to this Agreement, shall employ not less than fifty percent (50%) of the workers employed on such work from the residents of the area where the work is performed or from among persons who are employed the greater percentage of their time in such area; any others shall be employed only from the contractor's home area.

(b) When an Employer or contractor from an area outside the geographical jurisdiction of District Council No. 11 is engaged in work within the geographical jurisdiction of District Council No. 11, he shall employ not less than fifty (50%) of the employees employed on such work from among the residents of the area where the work is performed or from among persons who are employed the greater percentage of their time in such area. Any others shall be employed only from the Employer's home area.

(c) The Employer party hereto shall, when engaged in work outside the geographical jurisdiction of the Union party to this Agreement shall comply with all of the lawful clauses of the Collective Bargaining Agreement in effect in said other geographic jurisdiction and executed by the Employers of the industry and the affiliated local unions in that jurisdiction, including but not limited to, the wages, hours, working conditions, fringe benefits, and procedure for settlement of grievances set forth therein; provided, however, that as to Employees employed by such Employer from within the geographic jurisdiction of the Union party to this Agreement and who are brought into an outside jurisdiction, such employees shall be entitled to receive the wages and conditions effective in either the home or outside jurisdiction, whichever are more favorable to such employees, and fringe benefit contributions on behalf of such employees shall be made solely to their home funds in accordance with their governing document. This provision is enforceable by the Local Union or District Council in whose

jurisdiction the work is being performed, both through the procedure for settlement of grievances set forth in its applicable Collective Bargaining Agreement and through the courts, and is also enforceable by the Union party to this Agreement, both through the procedure for settlement of grievances set forth in this Agreement and through the courts. The Employer shall not be permitted to evade its obligations hereunder by setting up an additional "home" or "branch" office or plant in an area outside its principal place of business.

## ARTICLE V

## SUPPORT OF PRIMARY ACTIVITY

Employees covered by this agreement shall have the right to respect any legal primary picket line validly established by any bona fide labor organization, and the Union party to this agreement has the right to withdraw employees covered by this agreement whenever the Employer party to the agreement is involved in a legitimate primary labor dispute with any bona fide labor organization.

## ARTICLE VI

## TERRITORIAL JURISDICTION

District Council No. 11 territorial jurisdiction is as follows; all cities and towns in the State of Connecticut and Rhode Island inclusive, and Fishers Island. Glaziers Massachusetts jurisdiction is as follows; the Counties of Dukes, Barnstable, Bristol, Nantucket, Franklin, Hampden, and Hampshire.

## ARTICLE VII

## JOB REGISTRATION

Employers shall register all jobs prior to starting, including out-of-area jobs, whether residential, commercial, or industrial by either phone or fax with the District Council No. 11 office. Any employer failing to do so may be found in violation by the District Council No. 11 Joint Trade Board.

## ARTICLE VIII

### WAGE RATES
### EFFECTIVE JUNE 1, 2003 THROUGH MAY 31, 2005

### RHODE ISLAND

| EFFECTIVE | 06/01/03 |
|---|---|
| Brush, Roller Drywall Finisher | 23.43 |
| Spray, Sand, Water Blasting | 24.43 |
| Application of Epoxy | 25.43 |

Tanks, towers, swingstage, boatswain chair, riding steel, bridges, all tanks, pipes, and vessels inside, and hazardous work of similar character: 25.43

| | | |
|---|---|---|
| Lead Abatement** | 25.43 | |
| Health & Welfare | 4.60 | Local 195 |
| Pension Fund | 2.75 | |
| Annuity Fund | 2.20 | |

District Council Labor Management Partnership Fund .05

| | | |
|---|---|---|
| Check Off (from gross wages) | 5% | |
| Joint Apprenticeship and Training Fund | .35 | 30. |
| LMCI | .05 | |
| PAT | .05 | |

January 1, 2004 - $.65 increase, June 1, 2004 - $.60 increase,

January 1, 2005 - $.69 increase.

** Lead Abatement premium will be paid to all employees inside containment during abrasive blasting, blow down, and clean up until containment is breached.

*** Foremen shall receive two dollar more per hour than the highest paid worker in the crew when the crew consists of five or more workers.

## ARTICLE IX

## HOURS OF WORK

1. The regular work day shall be eight (8) hours, from 7:00/8:00 a.m. to 11:00/12:00 noon and 11:30/12:30 to 3:30/4:30 p.m. One-half (1/2) hour from 11:00/12:00 noon to 11:30/12:30 p.m. shall be observed as the lunch period. The regular work week shall be forty (40) hours, Monday through Friday beginning at 7:00/8:00 a.m. on Monday and ending at 3:30/4:30 p.m. on Friday.

   Saturday may be used as a voluntary make up day at straight time rates when time is lost during the regular work week due to inclement weather.

2. All hours in excess of the regular work day and work week and all work performed outside of the regular work day or week shall be considered overtime. Overtime on days recognized as regular work days or on Saturdays and Sundays shall be paid for at the rate of one and one-half times the regular rate. Overtime on Holidays shall be paid for at the rate of double time.

3. **Second Shift:** The second shift shall be worked between the hours of 3:30/5:00 p.m. and 12:00/1:30 a.m., and all employees shall be paid a premium of $2.00 per hour.

4. **Third Shift:** The third shift shall be worked between the hours of 10:00/12:00 midnight and 6:30/8:30 a.m., and all employees shall be paid a premium of $3.00 per hour.

5. Shift rates will be paid as per above when there is a first or second shift worked prior to the start of the shift to be eligible for second or third shift pay.

   Employees shall be given forty eight (48) hours notice before being required to change shifts. If not, regular overtime rules will apply.

6. There shall be a thirty (30) minute lunch period allowed on all shifts.

7. There shall be one fifteen (15) minute coffee break allowed on all shifts.

8. All overtime shall be reported to the District Council office either by phone or fax. All overtime shall be distributed equally, if possible, to all workers currently working on the project where the overtime is to be worked. The Steward shall enforce this provision and be included in all overtime work.

9. **Holidays:** The following Holidays shall be observed on either the day of the Holiday or the day celebrated as such: **Connecticut** - New Year's Day, Good Friday, Memorial Day, July 4th, Labor Day, Thanksgiving Day and Christmas Day. **Rhode Island** - New year's Day, Memorial Day, July 4th, VJ Day, Labor Day, Columbus Day, Veterans Day, Thanksgiving Day and Christmas Day.

10. There shall be at least one (1) Foreman to every five (5) working members on the job or fraction thereof.

11. Whenever the Employer deems it necessary to employ a General Foreman on any particular project, the General Foreman shall be a painter and the General Foreman (except in emergencies or in the absence of the General Foreman) is the only representative of the Employer who shall issue instructions to the Foreman.

## ARTICLE X

## BRIDGE PAINTING

Bridge painting shall be performed under the terms and conditions as set forth in this agreement.

## ARTICLE XI

## APPRENTICE WAGES AND RATIOS

**SECTION 1.** The rate of wages for apprentices shall be the following percentages of the journeymen wage rates:

| | | | |
|---|---|---|---|
| First | 1,000 hours - 50% | Fourth | 1,000 hours - 65% |
| Second | 1,000 hours - 55% | Fifth | 1,000 hours - 70% |
| Third | 1,000 hours - 60% | Sixth | 1,000 hours - 75% |

**Please note*** Pension and Annuity for first and second year apprentices shall be as follows. First year .50 pension and .50 annuity. Second year .50 pension and 1.00 annuity. All other fringes shall be paid as contained in this agreement. Third and fourth year apprentices shall receive full fringe benefits for all hours worked.**

**SECTION 2. Ratio of Apprentices**

Every Employer who employs three (3) or more journeymen shall employ at least one (1) apprentice. The J.A.T.C. will establish the ratio and maximum number of apprentices per Employer in addition to the above.

**SECTION 3.** All working rules and regulations governing apprentices other than those contained in this Agreement shall be as set forth in District Council No. 11's J.A.T. Standards.

## ARTICLE XII

## FRINGE BENEFIT CONTRIBUTIONS

Employers hereunder shall make contributions to the fringe benefit trust funds enumerated, hereinafter referred to as the "Funds", in the amounts set forth below for each hour worked by each employee covered under this Agreement on and after the effective dates indicated:

**International Union of Painters and Allied Trades Union and Industry Pension Fund**

| Effective Date | Hourly Rate |
|---|---|
| June 1, 2003 | $ 2.75 |

**International Union of Painters and Allied Trades Union and Industry Annuity Fund**

| Effective Date | Hourly Rate |
|---|---|
| June 1, 2003 | $ 2.20 |

**Painters and Allied Trades Local Union 195 Health and Welfare Fund**

| Effective Date | Hourly Rate |
|---|---|
| June 1, 2003 | $ 4.60 |

**District Council No. 11 Joint Apprenticeship and Training Fund**

| Effective Date | Hourly Rate |
|---|---|
| June 1, 2003 | $ 0.35 .30? |

**Labor Management Cooperation Fund**

| Effective Date | Hourly Rate |
|---|---|
| June 1, 2003 | $ 0.05 |

**District Council Labor Management Partnership Fund**

| Effective Date | Hourly Rate |
|---|---|
| June 1, 2003 | $ 0.05 |

**Political Action Fund**

| Effective Date | Hourly Rate |
|---|---|
| June 1, 2003 | $ 0.05 |

Please note that Dues Check off and the Political Action Fund are employee deductions. All other contributions are the responsibility of the employer.

## ARTICLE XIII

## PAYMENT OF WAGES

Employees shall be paid weekly, not later than Friday, at the place where the work is performed or a mutually acceptable location.

**SECTION 1.** All wages shall be paid in cash or negotiable check and shall be accompanied by a statement of gross earnings and any deductions legally made. Such statement shall show the Employer's name, the hourly rate of pay, the dates and hours worked, all deductions made and the net amount due the employee. Wage payments shall conform with all applicable Federal and State laws.

**SECTION 2.** The Employer agrees to show all data on weekly pay envelope/check stub.

**SECTION 3.** When an Employee is laid off, he/she shall receive his/her pay in full one-half (1/2) hour before quitting time and shall be allowed to pack his/her gear and clean up at that time and leave the job.

**SECTION 4.** The Employer agrees not to lay off workers before one-half (1/2) hour before quitting time except in cases where the job is completed, or bad weather prohibits work.

**SECTION 5.** If a contractor pays by checks and defaults in payment one time, all future wages shall be paid in cash.

**SECTION 6.** A minimum of three hours per day shall be paid if employees are present for work at 8:00 a.m. (or earlier depending on jobsite conditions) and the weather and/or site conditions are suitable for commencing a days work.

**SECTION 7.** On all jobs bid by an employer regardless of type, the wage and fringe rates contained in this agreement shall be paid to all employees for the current effective dates for wages and fringes. Any and all wage and fringe increases which may occur during an ongoing job shall automatically apply to all members of District Council No. 11 when due, regardless of bid price when job was originally bid. Wage rates and fringe rates are listed in this current Agreement by effective dates so as to allow the employer when bidding a job to select the proper current wages and fringes and the proper future wages and fringes. Failure to pay the proper wages and or

fringes then current will result in an automatic violation of this agreement and subject to Joint Trade Board actions and/or fines, after due process, which may include back pay and fringes and all costs associated with any legal fees or actions needed to enforce the foregoing provision. On prevailing wage jobs, all wages, and benefits published in the specifications at the time of the bid shall prevail throughout the duration of the job, (unless there are provisions for increases to be paid). Any employee refusing to work on prevailing rate jobs where the rates are less than the current contract rate and the employer has no other work, the employee will not be discriminated against and laid off in a manner so they can receive unemployment benefits.

**SECTION 8.** The Employer shall at the termination of a job enclose with each employee's wages the appropriate State Unemployment Notice Form, stating the date last worked and the reason for being laid off. Failing to comply with this rule, the Contractor will be subject to penalty of continuance of wages until officially laying off the Employee by producing the proper form as required by law. This provision applies only in states that it is required.

## ARTICLE XIV

## MARKET RECOVERY

The District Council reserves the right to establish wages and or benefit contributions that are different than those contained in this agreement for the then current term, for the purpose of organizing, maintaining and/or recapturing work opportunities. The Union for the purposes listed above can change the terms and conditions of this Agreement as it sees fit at their sole and absolute discretion. All contractors shall be notified of any changes and/or concessions by either fax or phone immediately after they are granted.

## ARTICLE XV

## EMPLOYER CONTRIBUTIONS AND PAYROLL DEDUCTIONS

**SECTION 1. Apprenticeship and Training Funds:**

The Employers and the Union hereby establish/maintain an Apprenticeship and Training Fund to be known as the "District Council No. 11 JAT Fund", (hereinafter referred to as the Apprenticeship and Training Fund) under a Trust Agreement attached hereto as Exhibit A and made part hereof.

1. (a) Commencing with the first day of June 2000, and for the duration of this Agreement, and any renewals or extensions thereof, the Employer, as defined in the Agreement and Declaration of Trust executed by and between the International Union of Painters and Allied Trades, District Council No. 11, agrees to make payments to the District Council No. 11 JAT Fund for each Employee covered by this Agreement, as follows:

(b) For each hour or portion of an hour for which an employee receives pay, the Employer shall make a contribution of 35 cents to the above named Apprenticeship and Training Fund.

(c) Contributions shall be paid on behalf of any employee starting with the employee's first hour of employment in a job classification covered by this Agreement... This includes, but is not limited to: apprentices and journeypersons.

(d) The payments to the Apprenticeship and Training Fund required above shall be made to the Painters District Council No. 11 JAT Fund which was established under an Agreement and Declaration of Trust, dated March 24, 1993. The Employer hereby agrees to be bound by and to the said Agreement and Declaration of Trust, as though he had actually signed the same.

(e) From the funds collected in the above manner, the Trustees of the Painters District Council No. 11 JAT Fund shall hold in trust the sum of five (5) cents per hour for each hour or portion of an hour for which an employee receives pay, and remit said sum to the International Union of Painters and Allied Trades Joint Apprenticeship and Training Fund (IUPAT-JATF) at such regular periods of time and in the manner and form as shall be determined by the Trustees of the International Fund.

(f) The payments to the International Fund required in above paragraph (e) shall be made to the IUPAT-JATF, which was established under an Agreement and Declaration of Trust dated May 1, 1995. The Employer hereby agrees to be bound by and to the said Agreement and Declaration of Trust, as though he has actually signed the same.

2. (a) The Employer hereby irrevocably designates as its representatives on the Board of Trustees of the IUPAT-JATF such Trustees as are now serving, or who will in the future serve, as Employer Trustees, together with their successors, as provided for in the aforesaid Trust Indenture.

(b) The Union hereby irrevocably designates as its representatives on the Board of Trustees of the IUPAT-JATF such Trustees as are now serving, or who will in the future serve, as Union Trustees, together with their successors, as provided for in the aforesaid Trust Indenture.

(c) The parties hereto further agree to be bound by all actions taken by the Trustees of the IUPAT-JATF pursuant to the said Agreement and Declaration of Trust.

3. All contributions shall be made at such time and in such manner as the Trustees require; and the Trustees shall have the authority to have a Certified Public Accountant audit the payroll and wage records of the Employer for the purpose of determining the accuracy of contributions to the Apprenticeship Fund.

4. If an Employer fails to make contributions to the Painters District Council No. 11 JAT Fund within twenty (20) days after the date required by the Trustees, such failure shall be deemed a violation of this Agreement, and the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any other provision hereof to the contrary notwithstanding, and the Employer shall be liable for all costs for collecting the payment due together with attorney's fees and such penalties as may be assessed by the Trustees. The Employer's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no-strike" clause which may be provided or set forth elsewhere in this Agreement.

5. The Apprenticeship Plan adopted by the Trustees of said Apprenticeship Funds shall at all times conform with the requirements of the Internal Revenue Code and other applicable laws and regulations so as to enable the Employer at all times to treat contributions to the Apprenticeship Fund as a deduction for income tax purposes.

**SECTION 2. Health & Welfare Fund:**

1. Employers agree to pay to this Fund as provided in Article VIII, and Article XII, such fund established in the name of the Painters and Allied Trades, Local Union 195. Said Fund is to be administered by a Board of Trustees, three (3) from the Union and three (3) from the Employers. The Board of Trustees shall be selected and appointed under the provisions of a trust agreement executed by Local Union 195 and Employers. Said Trust agreement shall conform to the Labor-Management Relations Act of 1947, and all other applicable laws and regulations of the United States of America and the State of Rhode Island. The said Fund will be used to purchase accident, death and disability, sickness or other benefits of a similar nature for said employees as provided in said Trust agreement.

2. If at any time the welfare fund is not fully funded, any negotiated increases will be allotted to that fund to insure that it is fully funded. If the fund is not fully funded and no new increases are negotiated, the basic hourly wage rate would be reduced and the money allotted to the fund to insure it is fully funded. The actuary will make the final judgment as to whether the fund is fully funded.

**SECTION 3. International Union of Painters and Allied Trades Union and Industry Pension Fund: The only agreement between the Employer(s) and the Union parties to this Agreement regarding pensions or retirement for Employment covered by this Agreement is as follows:**

1. (a) Commencing with the 1st day of June, 2000, and for the duration of this Agreement, and any renewals or extension thereof, the Employer agrees to make payments to the PAT International Union and Industry Pension Fund for each employee covered by this Agreement as follows:

   (b) For each hour or portion thereof for which an employee receives pay, the Employer shall make a contribution as specified in Article XIV, to the above-named Pension Fund.

   (c) For the purpose of this Article, each hour paid for, including hours attributable to show-up time, and other hours for which pay is received by the employee in accordance with the Agreement, shall be counted as hours for which contributions are payable.

   (d) Contributions shall be paid on behalf of any employee starting with the employee's first day of employment in a job classification covered by this Agreement. This includes, but is not limited to, apprentices and journeypersons.

   (e) The payments to the Pension Fund required above shall be made to the PAT International Union and Industry Pension Fund, which was established under an Agreement and Declaration of Trust, dated April 1, 1967. The Employer hereby agrees to be bound by and to the said Agreement and Declaration of Trust, as amended from time to time, as though he had actually signed the same.

2. The Employer hereby irrevocably designates as its representative on the Board of Trustees such Trustees as are now serving, or who will in the future serve as Employer Trustees, together with their successors. The Employer further agrees to be bound by all actions taken by the Trustees pursuant to the said Agreement and Declaration of Trust, as amended from time to time.

3. All contributions shall be made at such time and in such manner as the Trustees require; and the Trustees may at any time conduct an audit in accordance with Article V, Section 6 of the said Agreement and Declaration of Trust.

4. If an Employer fails to make contributions to the Pension Fund within twenty (20) days after the date required by the Trustees, the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any other provision hereof to the contrary notwithstanding, and the Employer shall be liable for all costs of collection of the payments due, together with attorneys' fees and such penalties as may be assessed by the Trustees. The Employer's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no strike" clause which may be provided or set forth elsewhere in this Agreement.

5. The Pension Plan and Annuity Plan adopted by the Trustees shall at all times conform with the requirements of the Internal Revenue Code so as

to enable the Employer at all times to treat contributions to the PAT International Union and Industry Pension Fund as a deduction for income tax purposes.

**SECTION 4. The Painters and Allied Trades Union Labor-Management Cooperation Fund.**

1. (a) Commencing with the 1st day of June, 2000, and for the duration of this Agreement, and any renewals or extension thereof, the Employer agrees to make payments to the Painters and Allied Trades

Labor-Management Cooperation Fund ("Fund") for each Employee covered by this Agreement as follows:

(b) For each hour or portion of an hour for which an employee receives pay, the Employer shall make a contribution of five cents ($.05) to the Fund.

(c) For the purpose of this Article and wherever similar language is used in this Agreement, each hour paid for, including hours attributable to show-up time, and other hours for which pay is received by the employee in accordance with the Agreement, shall be counted as hours for which contributions are payable.

(d) Contributions shall be paid on behalf of any employee starting with the employee's first day of employment in a job classification covered by this Agreement. This includes, but is not limited to, apprentices and journeypersons.

2. (a) The Employer and Union signatory to this Agreement agree to be bound by and to **the Agreement** and Declaration of Trust, as amended from time to time, establishing the Fund.

(b) The Employer hereby irrevocably designates as its representatives on the Board of Trustees such Trustees as are now serving, or who will in the future serve as Employer Trustees, together with their successors.

(c) The Union hereby irrevocably designates as its representatives on the Board of Trustees such Trustees as are now serving, or who will in the future serve as Union Trustees, together with their successors.

3. All contributions shall be made at such time and in such manner as the Trustees require, and the Trustees may at any time conduct an audit in accordance with the Agreement and Declaration of Trust.

4. If an Employer fails to make contributions to the Fund within twenty (20) days after the date required by the Trustees, the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any other provision hereof to the contrary notwithstanding, and the Employer shall be liable for all costs of collection of the payments due, together with attorneys' fees and such penalties as may be assessed by the Trustees. The Employer's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no strike" clause which may be provided or set forth elsewhere in this Agreement.

**SECTION 5. Check-off: Administrative Dues, Political Action Together**

1. Every Employer signatory to this Agreement hereby agrees to deduct the appropriate dues checkoff as specified in the District Council 11 Bylaws from any employee employed by such Employer during the term of this Agreement.

   (a) The Union will notify the Employer in writing of the amount of Administrative Dues specified in the bylaws, and will submit to the Employer a copy of the bylaws or the applicable by-law provision.

   (b) For each payroll period, the Employer will deduct from the wages of each employee the amount specified in the bylaws based on the number of hours worked during said payroll period, and will accumulate said deductions to the end of the month.

   (c) On or before the twentieth (20th) day of each month, the Employer will remit to the Union the entire amount of Administrative Dues, due and owing as to each employee for the month previous, together with a list of employees covered hereby and the number of hours worked by each during the applicable period.

2. (a) When a signatory Employer performs a job within the jurisdiction of a union affiliated with the IUPAT other than the Union signatory hereto and the bylaws of that other Union contain a provision for Administrative Dues, or business representative/Business Manager "assessment", the Employer shall check-off from the wages of employees covered by this Agreement and employed on the job Administrative Dues, or business representative/Business Manager "assessment", in the amount stated in that other Union's bylaws and shall remit said amount to that other Union. In that event, the other Union shall be acting as agent of the signatory Union for the purpose of policing and administering this Agreement. In performing the check-off, the procedure specified in Section 1, a-c will be followed, except that it shall be the responsibility of said other Union to notify the Employer in writing of the amount of Administrative Dues or business representative/Business Manager "assessment", specified in its bylaws, and to submit to the Employer a copy of the bylaws for the applicable by-law provision. When the signatory Employer performs a job within the jurisdiction of a Union affiliated with the IUPAT other than the Union signatory hereto, and the bylaws of that other Union contain no provision for administrative dues, the Employer shall continue to be bound by Section 1.

2. (b) Every Employer signatory to this Agreement hereby agrees to check-off any employee employed by such Employer during the term of this Agreement Political Action Together and Foundation For Fair Contracting contributions in the amounts specified in this Agreement. Employers shall remit said amounts to the Union following the procedure set forth above in SECTION 4. (a-c) for the remittance of Administrative Dues.

3. <u>**Employees Covered**</u>: The obligations of the employer under Section 1 and Section 2 of this Article shall apply only as to employees who have voluntarily signed a valid dues deduction authorization card.

4. **Authorization Card**: At the time of employment of any employee, the Employer will submit to each such employee for his voluntary signature an agency fee or a dues deduction authorization card in duplicate, one copy of which is retained by the Employer and the other returned to the Union with their next funds remittance report, the form to be supplied such Employer by the Union.

5. **Monthly List**: On or before the twentieth (20th) day of each month, the Employer will submit to the Union a list of all employees covered by the Agreement who have not signed a dues deduction and/or agency fee authorization card, together with the number of hours worked by such Employee during the month previous.

The Union and/or Trust Funds may at any time conduct an audit of the Employer's records to insure proper payments have been made. Failure to pay pension and welfare payments when due, contractor must post cash bond on demand to cover such payments past due and future estimated payments to conform with perspective Trust Agreements.

Every employer party to this agreement shall post a ten thousand ($10,000.00) dollar surety bond with the District Council No. 11 Funds (R.I.Painters 195 Health Fund) to cover payments on behalf of the District Council No. 11 members benefits. Until such surety bond can be posted, a minimum $2,500.00 dollar cash bond shall be held by the District Council No. 11 Funds. All interest will be used in administration of these procedures.

Collections for Health, Pension and Annuity, Apprenticeship, Dues Checkoff, Labor Management Cooperation Fund, Political Action Together, Foundation For Fair Contracting and any other such negotiated contributions, are to be submitted on one form and sent to District Council No. 11 with separate checks. Completed forms and payments are due not later than twenty (20) days after the month covered by the report. If the contractor is delinquent in payment, the Union will notify the contractor by the 15th of the delinquent month, reminding the contractor he is delinquent and clearly in violation of this Article.

If payment is not received immediately, the Union will have the right to notify its members that said contractor is in violation and the Union can prevent its members from working for the delinquent contractor sixty (60) days after the month covered by the report.

Each Board of Trustees and/or Union will take action to secure compliance with this Agreement including attorneys' fees, interest, penalties, and court costs.

The Employer's liability for payment under this Article shall not be subjected to or covered by any grievance or arbitration procedure or any "no strike" clause which may be provided or set forth elsewhere in this Agreement. The Employer agrees that the Union or Trustees shall be able to get an injunction to obtain immediate payment of the above money.

All funds adopted by the Trustees shall at all time conform with the requirements of the Internal Revenue Code so as to enable the Employer at all times to treat contributions to said funds as a deduction for income tax purposes.

Employers found to be delinquent in remittals required by this Article shall be liable for all costs incurred by the Union and/or Trust Funds in securing compliance including court, audit, and attorney fees.

## ARTICLE XVI

## UNION REPRESENTATION

**SECTION 1.** Any District Council No. 11 Representative shall have the right to visit all jobs and shops for the purpose of ascertaining whether the provisions of this Agreement are being carried out.

**SECTION 2. Job Stewards:**

1. When it is for the best interest of District Council No. 11, the District Council reserves the right to place a Steward on any and all jobs within the jurisdiction of the District Council. If and when a Steward is placed on a job with a local contractor the Steward will be selected from that contractors regular work force if at all possible.

2. Stewards shall report all overtime on regular work days within twenty-four (24) hours to the District Council No. 11 office as to the number of employees and hours worked. Stewards shall also make this report at the first regular meeting.

3. All employees shall show their work cards or dues books to the Steward on the job, and shall support the Steward in the performance of their duties. Employees shall also upon request by a District Council Representative produce any and all pay stubs.

4. The Job Steward shall report all accidents to the Employer and the District Council office.

5. No Job Steward shall act in any supervisory capacity.

6. Any member who acts as Job Steward in accordance with the appointment and loses employment through the performance of Union-related duties as such, shall report the matter to the Business Manager/Secretary Treasurer, and an investigation of same shall be made by the District Council. Upon proof being secured that said Job Steward had been discriminated against, owing to the faithful work for the District Council, all employees at work in such shops shall be withdrawn until satisfactory adjustment has been reached, any provision to the contrary notwithstanding.

7. Job Stewards shall be allowed a reasonable time, whenever necessary, for the policing of job or conditions. Said activities will be performed in conjunction with the Foreman on the job. In no event shall a Job Steward be discharged, laid off, or transferred to another job until both the Employer and the District Council have had an opportunity to investigate the charge against the Steward. The Steward shall be the last employee on the job, exclusive of Foreman.

8. Whenever there is overtime on a job, the Steward shall be part of the work force.

## ARTICLE XVII

## TRADE RULES AND WORKING CONDITIONS

**SECTION 1.** Neither the Union nor the Employer shall discriminate against any employee or applicant because of race, color, creed, sex, or national origin.

**SECTION 2.** Each journeyperson and apprentice of the Painting Trades shall be required to furnish at least the following tools of the trade: wall knives, white overalls, putty knives, duster, hammer, screwdriver, pot hooks, sanding poles, wire snips (bridge painters only) work shoes, and steel toed work shoes if required by job site safety program. Paperhangers and Tapers shall likewise be required to provide such tools of the trade. Each journeyperson and apprentice in the Glass and Glazing Trades shall furnish tool box, combination square, glass pliers and offset breakers, wood, metal and coal chisels, claw and plastic hammers, snips straight, right and left, screwdrivers (assorted), nail sets, crescent wrench, yankee screwdriver and bits, pliers (assorted), hacksaw, chalk line, dividers, allen wrench set, files (assorted), wrenches (assorted), socket wrench set (assorted), all other tools necessary to perform the work of the trade will be provided by the employer.

**SECTION 3.** It is agreed that the Employer shall not layoff or discharge an employee because of any Union activity or because of any complaints to the Union against the Employer.

**SECTION 4.** The Union will not allow any member to contract work that would normally be done by contractors signatory to the District Council No. 11 Working Agreement at any time.

**SECTION 5.** All workers shall be allowed five (5) minutes wash-up before Lunch and quitting time and furnished with clean water, soap, and towels; also, fresh drinking water in sanitary water container with paper cups. Spray persons and helpers shall be allowed reasonable time for personal clean-up.

**SECTION 6.** No employee shall be penalized or disciplined in any way for his refusal to work with Red Label/epoxy products.

**SECTION 7.** Any employee working with stilts shall adhere to all appropriate and applicable OSHA guidelines pertaining to safety. Job site must remain safe and clutter free at all times while wearing stilts.

**SECTION 8.** No employee shall be penalized or disciplined in any way for his refusal to wear stilts.

**SECTION 9.** Where feasible, the Employer agrees to provide a dressing room for all employees use in storing street clothes and tools. Same to be provided with lock and key to be in the charge of Foreman and/or job steward.

**SECTION 10.** The Employer agrees to furnish adequate and safe scaffolding, ladders, and other equipment necessary for the proper performance of the work.

**SECTION 11.** Employees shall not be transported or transferred of their own accord from job to job during lunch period.

**SECTION 12.** The Employer shall deliver all materials and equipment to the job. No employees shall be made to transport bulky or heavy materials or equipment in his car.

## ARTICLE XVIII

## INSURANCE

Employer agrees to carry Workman's Compensation and Liability Insurance and he shall carry Unemployment Insurance, if employing one or more journeymen. Certificate number of Unemployment Insurance shall be furnished.

## ARTICLE XIX

## SAFETY

In accordance with the requirement of the Occupational Safety and Health Act of 1970, it shall be the exclusive responsibility of the Employer to ensure the safety of its employees and compliance by them with any safety rules contained herein or established by the Employer. Nothing in this Agreement will make the Union liable to any employees or to any other persons in the event that work-related disease, sickness, death, injury, or accident occurs.

The Employer will not engage in any litigation against the Union on a subrogation theory, contribution theory, or otherwise, so as to obtain a money judgment from it in connection with any work-related disease, sickness, death, injury, or accident.

If any judgment of liability is entered against the Union in connection with work-related disease, sickness, death, injury, or accident, the Employer agrees to indemnify the Union to the full extent of such liability, as well as any costs and attorney's fees awarded against or incurred by the Union in such litigation.

The Employer shall at all times, provide safe tools, materials and equipment and safe working conditions. If at any time, in the opinion of an employee, such tools, materials, or equipment or working conditions are unsafe and constitute a hazard to health or physical safety, the employee shall have the right to refuse to work with such tools, materials and equipment or under such hazardous conditions unless or until they are made safe. No employee shall be dismissed, disciplined, or otherwise discriminated against, nor shall his pay be withheld, for refusal to work with such unsafe tools, materials, or equipment or under such unsafe or hazardous working conditions.

The Employer agrees that during the life of this Agreement, the Employer will comply with all applicable Federal and State laws concerning occupational safety and health, including all applicable standards, rules and regulations issued pursuant thereto.

The Employer shall provide, at no cost to the employee, all necessary personal protective equipment and instructions on proper use of such equipment. The Employer shall provide for the proper maintenance and cleaning of all necessary personal protective equipment. If at any time, in the opinion of an employee, such personal protective equipment is defective, has not been properly maintained, or is not the appropriate personal protective equipment under the particular working conditions, the employee has the right to refuse to work with such equipment. No employee shall be dismissed, disciplined, or otherwise discriminated against, nor shall his pay be withheld for refusal to work with such defective, improperly maintained, inappropriate personal protective equipment. The employee shall immediately report to the Employer such defective, improperly maintained, or inappropriate personal protective equipment.

The Employer shall notify the Union sixty (60) days in advance of any changes in conditions of employment that may affect the health and safety of employees.

Except as clearly and specifically required by law or regulation, the Employer shall not require any employee to sign a form or statement dealing with health and safety, hazards in the workplace, or instruction and training relating to hazards in the workplace, unless that form or statement has been negotiated with and agreed upon by the Union.

## ARTICLE XX

## NO SUBCONTRACTING CLAUSE

The Employer will not contract out, subcontract or outsource any job site work covered by this Agreement to any sub contractor or other person unless that sub contractor or other person is a party to a collective bargaining agreement which incorporates wages, hours and working conditions which are the equivalent of those specified in this agreement or the existing collective bargaining agreement of any affiliate of the IUPAT which is applicable in the area where the work or the job is to be performed, whichever is the most favorable to the employees of the said sub contractor or other person. This will apply in all instances accept where such subcontractor or other person is not available.

## ARTICLE XXI

## PRESERVATION OF WORK

**SECTION 1.** To protect and preserve, for the employees covered by this Agreement, all work they have performed and all work covered by this Agreement, and to prevent any device or subterfuge to avoid the protection and preservation of such work, it is agreed as follows:
If the Employer performs on-site construction work of the type covered by

## ARTICLE XXIII

## GRIEVANCE PROCEDURE

1. The parties shall establish and maintain a Joint Trade Board both in Rhode Island and Connecticut, composed of six members, three appointed by the Union and three appointed by the Employer. Four members, two appointed by each party, shall constitute a quorum. Decisions shall be made by a majority vote, provided that Union appointees and Employer appointees shall have equal voting strength with respect to such vote. Members of the Joint Trade Board shall choose a Chairman and Secretary, to serve such terms as may be agreed upon by the Board, provided that one such officer shall be a Union appointee and one an Employer appointee.

2. The Joint Trade Board is empowered to hear and decide all grievances and disputes which arise between the parties as to the interpretation or application of this Agreement; to award or assess remedies, damages and penalties for violations of this Agreement; to issue interpretative rulings or other rules and regulations as it deems necessary to give force and effect to the purpose and intent of this Agreement; to investigate all grievances and disputes submitted to it, including the conduct of audits of Employer records; to recommend amendments to or committees as may be necessary to aid the Board in the performance of its duties; and to demand of Employers who repeatedly violate this Agreement the posting of a cash or surety bond to assure future compliance.

3. All grievances and disputes shall be submitted to the Secretary in written form, with copy furnished to the opposing party.

4. The Joint Trade Board shall meet whenever necessary. Special meetings may be called by the Chairman or Secretary when a prompt hearing and decision is required in any given dispute and shall be scheduled no more than four days after written notice is received by the secretary.

5. No Union representative shall sit as a Board member in any case involving himself or herself or his or her Employer, directly or indirectly; and no Employer representative shall sit as a Board member in any case involving himself or herself or any of his or her employees, directly or indirectly.

6. Decisions, awards, or orders of the Board shall be final and binding.

7. The Board shall maintain full and complete records and minutes of its proceedings, which records and minutes may be inspected at reasonable times by the parties to this Agreement.

8. Finances of the Joint Trade Board shall be derived from fees, assessments, fines, or levies, other than actual damages, which may be imposed by the Board.

9. If the Joint Trade Board deadlocks or otherwise fails to decide any grievance or dispute, either party may, within 30 days following said deadlock or failure, refer the grievance or dispute to arbitration by filing a written request with the Secretary of the Board, with copy served on the opposing party. On receipt of such notice, the Joint Trade Board shall choose an arbitrator. If the Board cannot agree on an

arbitrator, it shall promptly request a list of arbitrators from the Federal Mediation and Conciliation Service (FMCS) {or the American Arbitration Association (AAA)}. On receipt of such a list, the Chairman and Secretary of the Board shall select an arbitrator from such list in accordance with the rules and regulations of the FMCS {or AAA}. The decision of the arbitrator shall be final and binding.

10. With respect to any individual Employer that fails to comply with a final and binding decision issued at any level of this grievance procedure, the Union may, in its discretion: (a) terminate this Agreement by 48 hours written notice to such Employer; or (b) continue this Agreement in effect but not be bound or restricted by any "no strike" clause or similar obligation hereunder and /or (c) resort to any legal recourse available to it, including a job action or strike.

11. There shall be no strike or lockout on any job over any grievance or dispute while it is being processed through this grievance procedure and until the said procedure has been exhausted. However, and notwithstanding any contrary provision of this Agreement, the Union may remove employees from any job(s) of an individual Employer who fails or refuses to pay the wages and fringe benefits, or to meet the schedule of hours, provided for and required by this Agreement, or refuses to stand trial under these procedures, or fails to comply with a final and binding decision issued at any level of this grievance procedure. When the Union removes employees from the job pursuant to this Section, the individual Employer involved shall pay all employees so removed an amount equal to one (1) day's pay at the employee's regular straight time rate, for the inconvenience and time-loss occasioned by his conduct. Nothing stated in this Section shall preclude the Employer from resorting to the grievance procedure with respect to any action of sanction taken or imposed by the Union hereunder.

12. Notwithstanding Sections 10. and 11. a final and binding decision, rendered as part of the grievance procedure, regarding the subcontracting clause of this Agreement shall be enforced solely through administrative or judicial proceedings.

13. The remedies and sanctions specified in Section 10. and 11. are in addition to other remedies and sanctions that may be permitted by other provisions of this Agreement or by operation of law.

## ARTICLE XXIV

## GENERAL SAVINGS CLAUSE

If any Article or Section of this Agreement should be held invalid by operation of law or by any tribunal of competent jurisdiction, or if compliance with or enforcement of an Article or Section should be restrained by such tribunal pending a final determination as to its validity, the remainder of this Agreement or the application of such Article or Section to persons or circumstances other than those as to which it has been held invalid or as to which compliance with or enforcement of has been restrained, shall not be affected thereby.

In the event that any Article or Section is held invalid or enforcement of or compliance with any Article or Section has been restrained, as above set forth, the affected parties shall meet at the request of the Union, for

In the event that any Article or Section is held invalid or enforcement of or compliance with any Article or Section has been restrained, as above set forth, the affected parties shall meet at the request of the Union, for the purpose of arriving at a mutually satisfactory replacement for such Article or Section during the period of invalidity or restraint. If the parties do not agree on a mutually satisfactory replacement within sixty (60) days after beginning of the period of invalidity or restraint, either party shall be permitted all legal or economic recourse in support of its demands notwithstanding any provision in this Agreement to the contrary.

## ARTICLE XXV

## DURATION CLAUSE

**SECTION 1.** This Agreement shall be in full force and effect from June 1, 2003 to and including May 31, 2005, and shall continue from year to year thereafter unless written notice of desire to cancel or terminate the Agreement is served by either party upon the other not less than sixty (60) days and not more than ninety (90) days prior to any subsequent contract year.

**SECTION 2.** Where no such cancellation or termination notice is served and the parties desire to continue said Agreement, but also desire to negotiate changes or revisions in this Agreement, either party may serve upon the other a written notice not less than sixty (60) days and not more than ninety (90) days prior to any subsequent contract year, advising that such party desires to revise or change terms or conditions of such Agreement. The respective parties shall be permitted all legal or economic recourse to support their requests for revisions if the parties fail to agree thereon. Nothing herein shall preclude the parties from making revisions or changes in this Agreement, by mutual consent, at any time during its term.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed by themselves or by their duly authorized agent, officer, or representative on the 8th day of July, 2003.

| CONTRACTOR | INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES DISTRICT COUNCIL # 11 |
|---|---|
| By: [signature] | By: [signature] |
| Title: Owner | Title: |
| For: | |
| Address: 70 Island Drive | By: |
| Coventry, RI | Title: |

As of January 4, 2004 the following rates will be in effect:

$5.25 Health & Welfare
2.20 Annuity
2.75 Pension
.35 Apprenticeship
.05 Labor Management
.05 Political Action (payroll deduction)
.05 D.C. 11 L.M.P.F.
5% deducted from gross wages (dues check off)

$23.43 Brush Roller
24.43 Spray
25.43 Epoxy
25.43 Tanks, Towers, Bridges, Swing Stage, and Structural Steel

*June 1, 2004 $.60
*January 1, 2005 $.69

* To be divided as determined by the members of Local 195 with concurrence of Fund Trustees

# EXHIBIT 2

JUN 09 2005

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| INTERNATIONAL UNION OF PAINTERS & ALLIED TRADES, DISTRICT COUNCIL NO. 11; DISTRICT COUNCIL NO. 11 APPRENTICESHIP & TRAINING FUND; DISTRICT COUNCIL NO. 11 LABOR MANAGEMENT PARTNERSHIP FUND; RHODE ISLAND PAINTERS & ALLIED TRADES, LOCAL UNION 195 HEALTH AND WELFARE FUND; and RICHARD J. TROUVE, in his official capacity as Business Representative for District Council No. 11 and Painters Local 195, Plaintiffs, v. KEITH ROBINSON PAINTING, INC., Defendant. | C.A. No. 04-145ML |

**AFFIDAVIT OF RICHARD TROUVE**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I, Richard Trouve, being first duly sworn, depose and state as follows:

1. That, at all relevant times, I was business representative for District Council No. 11 and Painters' Local 195 and a trustee for the Rhode Island Painters' Local 195 Health and Welfare Fund.

2. That, from the period of October 2003 through December 2003, Defendant Keith Robinson Painting, Inc. failed to make any contributions to Plaintiff Funds.

3. That Defendant reported to the Fund that members of Plaintiff District Council No. 11 ("union members") had worked the following number of hours for Defendant:

   October 2003: 2989.5
   November 2003: 2910.5
   December 2003: 1616.5

4. That, from the period of October 2003 through December 2003, Defendant deducted $8,805.56 from the paychecks of union members.

5. That Defendant failed to remit to Plaintiff Funds any of the monies that he deducted from union members' paychecks from the period October 2003 through December 2003.

6. That, excluding interest, penalties, attorneys' fees, and costs, Defendant does owe Plaintiffs a total balance of $46,388.09 in unpaid contributions and dues as indicated in the Summary of Claim.

7. That the foregoing account is just, true and accurate, and said balance is now due Plaintiff from Defendant.

8. That no part of the $46,388.09 that is owed has been paid or satisfied. However, Plaintiff Funds expect to receive a $10,000 bond payment from Hartford Fire Insurance Company.

9. That the aforementioned amount owed does not include interest, attorneys' fees, costs or penalties.

Richard J Trouve

Richard Trouve
***Business Representative***
International Union of
Painters and Allied Trades
DISTRICT COUNCIL NO. 11

Subscribed and sworn before me on this 6 day of June, 2005.

Ellen C. McAuliffe
Notary Public

My commission expires: 6.28.09

# EXHIBIT 3

# SUMMARY OF CLAIM

| MONTH | DUE | HOURS | RATE | CONTRIB. OWED | INTEREST RATE | DAYS LATE | INTEREST OWED | PENALTY 20% | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| | | | | **H & W Fund** | | | | | |
| Oct. 03 | 11/20/03 | 2989.5 | $4.60/hr. | $13,751.70 | 4%/annum | 567 | $854.49 | $2,750.34 | |
| Nov. 03 | 12/20/03 | 2910.5 | $4.60/hr. | $13,388.30 | 4%/annum | 537 | $787.89 | $2,677.66 | |
| Dec. 03 | 01/20/04 | 1616.5 | $4.60/hr. | $7,435.90 | 4%/annum | 506 | $412.34 | $1,487.18 | |
| SubTotal | | | | $34,575.90 | | | $2,054.72 | $6,915.18 | $43,545.80 |
| | | | | **Apprenticeship Fund** | | | | | |
| Oct. 03 | 11/20/03 | 2989.5 | $.35/hr. | $1,046.33 | 4%/annum | 567 | $65.02 | $209.27 | |
| Nov. 03 | 12/20/03 | 2910.5 | $.35/hr. | $1,018.68 | 4%/annum | 537 | $59.95 | $203.74 | |
| Dec. 03 | 01/20/04 | 1616.5 | $.35/hr. | $565.78 | 4%/annum | 506 | $31.37 | $113.16 | |
| SubTotal | | | | $2,630.79 | | | $156.34 | $526.16 | $3,313.29 |
| | | | | **Partnership Fund** | | | | | |
| Oct. 03 | 11/20/03 | 2989.5 | $0.05 | $149.48 | 4%/annum | 567 | $9.29 | $29.90 | |
| Nov. 03 | 12/20/03 | 2910.5 | $0.05 | $145.53 | 4%/annum | 537 | $8.56 | $29.11 | |
| Dec. 03 | 01/20/04 | 1616.5 | $0.05 | $80.83 | 4%/annum | 506 | $4.48 | $16.17 | |
| SubTotal | | | | $375.84 | | | $22.33 | $75.17 | $473.34 |
| **ERISA** | **Fund** | **Subtotal** | | $37,582.53 | | | $2,233.39 | $7,516.51 | $47,332.43 |
| **Attorneys** | **Fees** | | | | | | | | $17,025.00 |
| **Costs** | | | | | | | | | $207.16 |
| **ERISA FUND TOTAL** | | | | | | | | | $64,564.59 |
| | | | | **Union Dues**<br>Amt. Deducted | | | | **$50/day penalty** | |
| Oct. 03 | 11/20/03 | 2989.5 | | $3,502.19 | 12%/annum | 567 | $652.85 | $26,850.00 | |
| Nov. 03 | 12/20/03 | 2910.5 | | $3,409.65 | 12%/annum | 537 | $601.97 | $25,350.00 | |
| Dec. 03 | 01/20/04 | 1616.5 | | $1,893.72 | 12%/annum | 506 | $315.03 | $23,800.00 | |
| **Union** | **Dues** | **Total** | | $8,805.56 | | | $1,569.85 | $76,000.00 | $86,375.41 |
| **TOTAL OWED** | | | | $46,388.09 | | | $3,803.24 | $83,516.51 | $150,939.99 |